UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
RODGER RICKETTES,

                    Plaintiff,                              MEMORANDUM
                                                        and ORDER
     -against-                                    12-CV-6427 (SMG)

POLICE OFFICER VINCENT TURTON
and POLICE OFFICER DANIEL REYES,

                    Defendants.
------------------------------------------------------------X
GOLD, S., U.S.M.J.:

## INTRODUCTION

       Plaintiff Rodger Rickettes brings this action pursuant to 42 U.S.C. § 1983 and state

common law.  Rickettes originally asserted claims under federal and state law for, among other

things, false arrest, excessive force and false imprisonment against the City of New York and six

police officers, including defendants Vincent Turton and Daniel Reyes.  Second Am. Comp.,

Docket Entry 22.  Plaintiff alleged in his complaint that, while riding the subway late one night,

he was approached by Officers Turton and Reyes, who searched him, removed him from the

train, and used pepper spray and an asp against him.  Second Am. Compl. ¶¶ 17-26.  Afterwards,

additional officers arrived and arrested plaintiff and held him at an NYPD command center and

later at Central Booking.  Second Am. Compl.  ¶¶ 28-32.  Rickettes claims he sustained injuries,

primarily a severely broken finger, as a result of the force used by Officers Turton and Reyes.

Second Am. Compl. ¶¶ 25, 31.

       The parties consented to the exercise of jurisdiction by a United States Magistrate Judge

in September of 2014.  Docket Entry 43.  On December 4, 2014, plaintiff stipulated to the

dismissal of all of his claims except those against Officers Reyes and Turton for excessive force

under § 1983 and assault and battery under New York state law.  Docket Entry 47.  These

remaining claims were tried to a jury beginning on December 15, 2014. Docket Entry 56. The jury returned a verdict in favor of Officer Turton, but against Officer Reyes, finding that Reyes used excessive force and awarding Rickettes $100,000 in compensatory damages. Jury Verdict, Docket Entry 64.

Defendants now move for judgment as a matter of law under Fed. R. Civ. P. 50 or, in the alternative, to set aside the verdict on the basis of qualified immunity. Docket Entries 72-77, 81. Plaintiff moves for an award of attorney's fees. Docket Entries 67-71, 78, 80. For the reasons set forth below, defendant Reyes' motion for judgment as a matter of law or to set aside the verdict on grounds of qualified immunity is denied. Plaintiff's motion for attorney's fees and costs is granted in the amount of $59,951.64.

## TRIAL TESTIMONY AND VERDICT

Rickettes testified at trial that he was riding the subway home from work on July 3, 2012, when, at about 1:30 a.m., he was approached by Officers Reyes and Turton, who were in plain clothes. Tr. 43, 47. Rickettes had walked through several subway cars to get to the last seat on the train, where he was sitting with headphones in his ears. Tr. 45-46. Officers Reyes and Turton asked Rickettes to show them his identification and then instructed him to exit the train and walk toward a wall. Tr. 48-49. Rickettes testified that he cooperated with the officers, although he acknowledged asking them multiple times, "for what?" Tr. 49. Despite his cooperation and for no apparent reason other than his questioning why he was being stopped, the officers—first Reyes, and then Turton—sprayed pepper spray in Rickettes' face. Tr. 50, 53, 109. The officers then hit him in his arms, legs, back and testicles with their asps. Tr. 50-51, 109. According to Rickettes, the officers sprayed him with mace and struck him with their asps for approximately five minutes. Tr. 124. Defendant Reyes hit Rickettes so hard that his asp bent.

Tr. 131-32. Rickettes never resisted, never struck the officers, and was standing relatively still and upright until he was handcuffed by other officers. Tr. 125-26, 128. At some point during this altercation, a knife Rickettes had in his possession fell out of his pocket and onto the floor of the subway platform. Tr. 51, 129. According to Rickettes, the knife—which he described on cross-examination as a "combat knife" with a "knuckle ring"—was closed at all times, and he made no attempt to retrieve it after it fell. Tr. 51-52, 97. Rickettes claims to have suffered severe testicular pain and bloody urine for three weeks as a result of the officers' blows. Tr. 59, 61. In addition, his index finger was broken, ultimately requiring surgery. Tr. 56, 62. Rickettes called his surgeon to testify about that procedure and the potential for recovery, and testified himself that he was unable to work for more than a year and a half as a result of the injury to his finger. Tr. 65, 337-38. Rickettes presented evidence of his lost wages and the cost of his medical care. Tr. 66-68, 83.

Defendants' testimony differed from the plaintiff's in several key respects. Defendant Reyes testified that he and defendant Turton were patrolling the subway line Rickettes was riding on the night in question and observed him walk through three subway cars to the last car. Tr. 152, 195. The officers found this behavior suspicious, so they followed Rickettes through the cars. Tr. 153. After Rickettes sat down, the officers approached him. Tr. 154. They then asked Rickettes for his identification and instructed him to get off the train with them. Tr. 160, 162. Reyes testified that Rickettes was not entirely compliant with their orders, because it took him a few seconds to acquiesce to their requests to present his identification and get off the train. Tr. 162, 164, 199. Reyes also testified that Turton instructed plaintiff to put his hands behind his back, but he instead put them in the air. Tr. 166-67. Then, according to Reyes, Rickettes turned around and swung at Turton, and it seemed to Reyes that Rickettes made contact. Tr. 167-69.

Rickettes then pushed Turton with both hands in the direction of the train tracks. Tr. 203. Reyes testified that he quickly radioed for more officers and took out his asp. Tr. 170. Simultaneously, defendant Turton began to spray Rickettes in the face with his pepper spray. Tr. 172. Reyes testified that he began hitting Rickettes on his arms and legs with his asp. Tr. 173-74. Reyes stated that Rickettes did not seem to be deterred from approaching Turton by the pepper spray Turton was deploying, and that he used the asp in an attempt to bring Rickettes to the ground and subdue him. Tr. 205. Reyes also testified that, contrary to Rickettes' testimony, only he used an asp on Rickettes, and explained that Turton does not even carry an asp. Tr. 209. Turton confirmed in his testimony that he did not have an asp with him during the officers' interaction with Rickettes. Tr. 218, 250.

Reyes acknowledged that he and Turton may have used mace and an asp on Rickettes for as long as five minutes, as Rickettes had testified. Tr. 180. According to Reyes, as he and Turton were using the asp and pepper spray, Rickettes struggled with them and threw punches. Tr. 181. Reyes and Turton took Rickettes to the ground two or three times, but Rickettes managed to wrestle free of them and stand up. Tr. 176. At one point when all three men were on the ground, Reyes saw Rickettes gripping an open knife in his hand. Tr. 176, 206. At that point, Reyes hit plaintiff's hand repeatedly with his asp, continuing until Rickettes released the knife and pulled his hand away. Tr. 178-79, 207.

Defendant Turton's description of the officers' encounter with Rickettes was similar to the one provided by Reyes. Like Reyes, Turton testified that Rickettes did not immediately agree to provide his identification or get off the subway train, but eventually did so. Tr. 229, 260-62. Once all three men had exited the train, Turton asked Rickettes to stand in the middle of the platform, and Rickettes repeatedly asked, "for what?" Tr. 233. Rickettes then reached

towards Turton, who reacted by extending his arm and telling Rickettes to give him some space. Tr. 234. Rickettes then came towards Turton and pushed him. Tr. 234, 238. Turton testified that Rickettes next swung as though to punch him, but missed. Tr. 238-39. Rickettes swung at Turton again, and this time he connected, landing a blow on Turton's shoulder. Tr. 239, 270-71. After this, Turton began to use pepper spray on plaintiff. Tr. 241. He used his can of pepper spray, which was partially full, and then used Reyes' can as well. Tr. 243-44. Turton testified that Rickettes did not seem to react to the pepper spray, so he continued administering bursts of it. Tr. 272. While Turton was using the pepper spray, Reyes was hitting Rickettes on his thighs and arms with his asp. Tr. 243, 275. As the officers were wrestling with plaintiff, Turton heard the sound of metal hitting the ground and then heard Reyes call out that there was a knife. Tr. 246, 278-79. Turton testified that, when he saw the knife for the first time, Rickettes was on the ground with his hand on top of the knife and Reyes was about to strike Rickettes' hand. Tr. 248, 279-80. Rickettes eventually released the knife and pulled his hand away. Tr. 281-82.

The jury returned its verdict in the early evening of December 17, 2014, finding defendant Reyes liable for using excessive force and awarding Rickettes $100,000 in compensatory damages. Tr. 507-09; Jury Verdict, Docket Entry 64. The jury declined to find liability on the part of defendant Turton or to award punitive damages. Jury Verdict, Docket Entry 64.

During trial, counsel for defendants moved to dismiss plaintiff Rickettes' claims and argued that the officers were entitled to qualified immunity. Tr. 366. Defendants proposed that, if the jurors found in plaintiff's favor, they be given special interrogatories with respect to qualified immunity after returning their verdict. Tr. 373. On December 17, before the close of the evidence in the case, defendants made their application for special interrogatories in a letter

brief and again proposed that, if the jury were to find for the plaintiff on his excessive force claim, the jurors then be sent to deliberate further over special interrogatories addressed to defendants' qualified immunity defense. Docket Entry 57. Defendants suggested two questions to be asked of the jury with respect to qualified immunity. Docket Entry 57. I denied defendants' motion for judgment as a matter of law. Tr. 371. In addition, and over plaintiff's oral objection, I granted defendants' request to pose special interrogatories after the jury reached its verdict. Tr. 493-98, 503-507. I followed this procedure based upon the Second Circuit's apparent approval of it in *Stephenson v. Doe*, 332 F.3d 68, 74, 80 (2d Cir. 2003) (directing district court conducting new trial on remand to follow the procedure it outlined during a pre-charge conference, where court suggested it would first hear the jury's general verdict on excessive force and then, if the jurors found in plaintiff's favor, submit specific interrogatories to guide the analysis of qualified immunity), and because other district courts, following *Stephenson*, have held it proper to do so. *See, e.g., Harewood v. Braithwaite*, 2014 WL 6867942, at *6 (E.D.N.Y. Dec. 5, 2014); *Guzman v Jay*, 303 F.R.D. 186, 196 (S.D.N.Y. 2014); *O'Hara v. McAvoy*, 2013 WL 4507067, at *2 (E.D.N.Y. Aug. 22, 2013).

With input from the parties, the following questions were posed to the jury after they rendered their verdict in Rickettes' favor: 1) Did Defendant Reyes use excessive force when he hit plaintiff on his arms and legs with his asp?; 2) Was plaintiff's finger struck before defendants saw a knife?; 3a) Did plaintiff reach for or grab his knife?; 3b) If not, did defendant Reyes reasonably believe that plaintiff reached for or grabbed his knife?; 4a) Was the knife open when defendants first saw it?; and 4b) If not, did defendants reasonably believe that the knife was open? *See* Court's Exhibit 8, Docket Entry 63.

The jury then retired to deliberate on the special interrogatories. After beginning their deliberations, the jurors sent a note reading, "We read the questions, and upon discussion among the jury members, we do not have simple and unanimous yes or no answers to several of the questions. In addition, we do not understand the purpose of the questions." Court's Exhibit 9, Docket Entry 63; Tr. 512. The jury was brought into the courtroom and instructed to continue deliberating and to try in good faith to reach unanimous answers to the questions. Tr. 515. After further deliberation, the jurors sent another note that read, "Judge Gold, we have answered the special interrogatories to the best of our abilities. The answers are unanimous." Court's Exhibit 10, Docket Entry 63. The jurors answered that defendant Reyes did use excessive force when he hit plaintiff on his arms and legs with his asp. Tr. 517; Court's Exhibit 8, Docket Entry 63. They did not answer the second question, which asked whether plaintiff's finger was struck before defendants saw a knife, and instead wrote "unsure" in the margin. Tr. 517; Court's Exhibit 8, Docket Entry 63. They answered that plaintiff did reach for or grab his knife, and thus did not need to answer question 3b. Tr. 517; Court's Exhibit 8, Docket Entry 63. They answered that the knife was not open when defendants first saw it, but that defendant Turton reasonably believed it was. Tr. 517; Court's Exhibit 8, Docket Entry 63. They wrote "Reyes: unsure" in the margin of question 4b, which asked whether defendants reasonably believed the knife was open. Tr. 517; Court's Exhibit 8, Docket Entry 63.

Defendant Reyes now moves for judgment as a matter of law or to set aside the verdict on the basis of qualified immunity. Reyes cites the jury's answers to the special interrogatories in support of his argument that he should not be held liable for using excessive force against the plaintiff, despite the jury's verdict.

**DISCUSSION**

**I.      Judgment as a Matter of Law**

When, as here, a party who has moved for judgment as a matter of law during a trial

renews that motion after the jury has rendered its verdict, the court may "direct the entry of

judgment as a matter of law."  Fed. R. Civ. P. 50(b).  A motion brought under Rule 50, though,

imposes "a heavy burden on a movant."  *Cash v. Cnty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011).

"That burden is particularly heavy where, as here, the jury has deliberated in the case and

actually returned its verdict in favor of the non-movant."  *Id.* (citing *Cross v. N.Y. Transit Auth.*,

417 F.3d 241, 248 (2d Cir. 2005)) (internal quotation marks omitted).  The motion may be

granted only "if there exists such a complete absence of evidence supporting the verdict that the

jury's findings could only have been the result of sheer surmise and conjecture or the evidence in

favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive

at a verdict against it."  *Id.*; *see also Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir.

2008).  In reviewing the evidence presented at trial, "the court must draw all reasonable

inferences in favor of the nonmoving party, and it may not make credibility determinations or

weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  In

addition, the court "must disregard all evidence favorable to the moving party that the jury is not

required to believe."  *Id.* at 151.

Excessive force claims are viewed in the context of the constitutional right allegedly

infringed by the force.  *See Graham v. Connor*, 490 U.S. 386, 394 (1989).  An excessive force

claim that arises out of an arrest invokes the Fourth Amendment prohibition against

unreasonable seizures.  *Id.*  To determine whether the force an officer uses to effectuate an arrest

is reasonable under the Fourth Amendment, courts balance "the nature and quality of the

intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotation marks omitted). This analysis recognizes that some degree of force is permitted in effectuating a lawful arrest, and thus "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* (internal citations and quotation marks omitted). Rather, the question is one of the officer's "objective reasonableness" in using force to arrest a suspect. *Graham v. City of New York*, 928 F. Supp. 2d 610, 617 (E.D.N.Y. 2013). The factfinder examining an excessive force claim considers at least these three factors: "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010). Although these factors are important, "the Fourth Amendment excessive force analysis is a contextual one that . . . requires close examination of the totality of the circumstances in each particular case." *Adedeji v. Hoder*, 935 F. Supp. 2d 557, 566 (E.D.N.Y. 2013).

There is no dispute as to the first factor of this inquiry. Rickettes was approached by the two defendant officers on the subway because they observed him walking between the train cars, a violation of the New York City Transit Rules of Conduct § 1050.9(4). This is a minor violation, as defendant Reyes acknowledges in his reply. Def. Reply in Support at 7, Docket Entry 81. The second and third factors were disputed at trial; plaintiff's testimony with respect to these factors differed from that of the two defendants in almost all material respects. Rickettes testified that he complied with each command the defendant officers gave him, even as he acknowledged asking the officers to explain why they were issuing those commands. He testified that he never hit or pushed the defendants, and did not in any way resist their efforts to

arrest him. According to Rickettes, the officers started spraying him with mace and hitting him with an asp without any physical provocation on his part, and continued to do so for approximately five minutes. While Rickettes acknowledged that a knife fell out of his pocket while Reyes was hitting him with his asp, he stated the knife was closed at all times and he never reached for it. Defendants, on the other hand, testified that Rickettes was not compliant, but was aggressive towards them. They each testified that Rickettes made aggressive movements toward Officer Turton, although they differed on some of the details. Defendants stated they used pepper spray and an asp to subdue Rickettes so they could handcuff him. Both officers acknowledged that Reyes hit plaintiff with the asp both before and after seeing Rickettes' knife, at first to gain control of Rickettes and later to force him to drop the knife which, they said, he was holding, open, with the blade exposed.

The jury was instructed, without objection, that "a law enforcement officer may employ only the amount of force that is reasonably necessary under the circumstances to make an arrest." Tr. 468. The jurors were entitled to believe all or some of plaintiff's testimony. Rickettes' testimony that he complied with all commands the officers gave him and did not resist arrest or attempt to hit or push or fight with them, if believed, certainly provides an ample basis for the jury's finding that Reyes used excessive force when he struck Rickettes with his asp. Similarly, the jury was entitled to believe Rickettes' testimony that, when the knife fell to the floor from his pocket, he was standing upright and did not reach for it. This testimony as well supports the jury's finding that Reyes used excessive force when he continued to strike Rickettes with his asp after seeing the knife.[1]

---

[1] As noted above, the jury answered special interrogatories after returning its general verdict and, in doing so, answered "yes" when asked "Did plaintiff reach for or grab his knife?" Because the jury returned its verdict before answering the special interrogatories, I am reluctant to consider the jury's responses to the special interrogatories in connection with defendant's Rule 50 motion. In any event, as the discussion in the text below makes clear, the

Defendant Reyes contends that the jury's finding that Turton did *not* use excessive force indicates that the jurors concluded that plaintiff must have been fighting or resisting, and that Reyes' use of his asp was therefore reasonable. Def. Mem. in Support at 11. This argument fails. First, there is no settled requirement that a jury's general verdicts be consistent. *See City of Los Angeles v. Heller*, 475 U.S. 796, 804-06 (1986) (Stevens, J., dissenting); *Saeed v. Kreutz*, 2015 WL 1501662, at * 3 (2d Cir. 2015); *Cash*, 654 F.3d at 343. Second, the verdicts in favor of Turton and against Reyes are not irreconcilably inconsistent. *See Shimon v. Wong*, 911 F. Supp. 87, 88 (E.D.N.Y. 1996) (pointing out that a Court faced with apparently inconsistent responses to special verdict questions should "adopt a view of the case, if there is one, that resolves any seeming inconsistency") (quoting *McGuire v. Russell Miller, Inc.*, 1 F.3d 1306, 1311 (2d Cir. 1993)). The jury may have concluded that Reyes used his asp in a way that involved more force than Turton's use of pepper spray or mace; this is likely given Rickettes' testimony about the injuries he sustained to his testicles and his finger as a result of Reyes' blows. Moreover, the evidence at trial was that Turton used mace before Reyes began striking Rickettes with his asp. Tr. 50, 241-42. Particularly if the jurors discounted the testimony at trial about the mace having little effect on Rickettes, they may have concluded that the use of mace was sufficient to address whatever resistance Rickettes offered, but that the use of an asp as well was excessive. Finally, the jury's verdict indicates only that they were not convinced by a preponderance of the evidence that Turton used excessive force; it does not reflect an affirmative finding that the force used by Turton was reasonable.

Defendant Reyes also seems to argue that the jury's verdict should be set aside because the jury apparently rejected, at least in part, some aspects of plaintiff's version of events. Def.

---

jury's determination that plaintiff reached for or grabbed his knife does not preclude a finding that Reyes used excessive force and that the force used proximately caused the injury to Rickettes' finger.

Mem. in Support at 10. More specifically, and pointing to the jury's answers to the special interrogatories, Reyes stresses that the jury found that defendant reached for or grabbed his knife. Assuming for the moment that it is proper to consider the jury's answers to special interrogatories on qualified immunity in deciding Reyes' Rule 50 motion, and therefore to conclude that the jurors found that Rickettes did reach for his knife, it does not inevitably follow that Reyes is entitled to judgment as a matter of law.

First, I note that a jury may choose to credit some aspects of a plaintiff's testimony and to disbelieve others. *See Medina v. Donaldson*, 2014 WL 1010951, at *6 (E.D.N.Y. Mar. 14, 2014) ("jurors are not required to accept the entirety of either side's account, but are free to accept bits of testimony from several witnesses and to make reasonable inferences from whatever testimony they credited") (quoting *Haywood v. Koehler*, 78 F.3d 101, 105 (2d Cir. 1996)) (internal quotation marks and brackets omitted). In this case, the jurors may have believed Rickettes' testimony that he offered no resistance, complied immediately with the officers' instructions, and stood still and upright from the time he was taken off the train until he was handcuffed. (In contrast, as discussed above, Reyes and Turton testified that they took Rickettes to the ground multiple times, and that Rickettes had the knife in his hand while they were wrestling with him as he resisted arrest.) Under the circumstances Rickettes described—or even under roughly similar circumstances that may nonetheless have left the jury unconvinced by a preponderance of the evidence that Turton's use of mace was excessive—the jury may have found that, even if Rickettes dropped a knife and bent to pick it up, he did not pose a threat serious and imminent enough to justify a finger-breaking series of blows from an asp.

Second, defendant Reyes' focus on the jury's finding that Rickettes reached for his knife is unduly narrow. A jury is not required to "dissect[] a[] police encounter into its separate

components in an excessive force case," or to view each specific act taken by police officers "in isolation." *Rasmussen v. City of New York*, 766 F. Supp. 2d 399, 405 (E.D.N.Y. 2011). Rather, jurors "must pay 'careful attention to the facts and circumstances' of the incident and determine whether, in light of the totality of the circumstances, the officers acted reasonably." *Id*. at 407 (quoting *Graham v. Connor*, 490 U.S. at 396). The jury in this case may have concluded that Officers Turton and Reyes had no legitimate reason to wrestle Rickettes to the ground, and that Rickettes' knife fell from his pocket only because the officers, employing excessive force, did so. Accordingly, the jury may have found that the finger-breaking blows administered by Reyes to Rickettes' hand resulted from the officers' earlier use of excessive force in taking Rickettes to the ground. *See*, *e.g.*, *Bernshtein v. City of New York*, 496 Fed. App'x 140, 143 (2d Cir. 2012) (holding that principles of causation borrowed from tort law, including proximate cause, apply to civil rights action brought pursuant to Section 1983). As the Court similarly reasoned in *Rasmussen*,

> the use of excessive force in greeting a suspect with a gratuitous attack might render the use of force in handcuffing a suspect excessive, even if that same force used in applying the handcuffs would not be excessive if viewed in isolation, because the additional difficulty in applying the handcuffs and the force required to do that could be the direct result of the excessive force used in attacking him.

766 F.Supp.2d at 405.

For all of these reasons, defendant Reyes' motion for judgment as a matter of law is denied.

## II.    Qualified Immunity

Defendant argues in the alternative that Officer Reyes is entitled to qualified immunity. Def. Mem. in Support at 13. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly

established at the time of the challenged conduct." *Reichle v. Howards*, __ U.S. __, 132 S. Ct. 2088, 2093 (2012); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine balances "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Where the right at issue in the circumstances confronting police . . . was clearly established but was violated, the officers will nonetheless be entitled to qualified immunity if it was objectively reasonable for them to believe their acts did not violate those rights." *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007) (internal quotation marks omitted). "Accordingly, a qualified immunity defense is established only if (1) the officers' actions did not violate clearly established law, or (2) it was objectively reasonable for the officers to believe that their actions did not violate such law." *Usavage v. Port Authority of New York and New Jersey*, 932 F. Supp. 2d 575, 593 (S.D.N.Y. 2013) (internal quotation marks and brackets omitted).

Generally, qualified immunity should be raised and its availability decided "at the earliest possible stage in the litigation." *Stephenson*, 332 F.3d at 77 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). However, while the first element of a qualified immunity defense—whether a right is clearly established is a matter of law—is determined by the court, "the matter of whether a defendant official's conduct was objectively reasonable, *i.e.* whether a reasonable official would reasonably believe his conduct did not violate a clearly established right, is a mixed question of law and fact." *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004). Thus, when the parties dispute the "material historical facts . . . the factual questions must be resolved by the factfinder." *Id*; *see also, Zellner*, 494 F.3d at 368; *Stephenson*, 332 F.3d at 81. Under such circumstances, "a court can resolve the issue as a matter of law on a Rule 50(b) motion

based on the jury's answers to special factual interrogatories." *Guzman v. Jay*, 303 F.R.D. 186, 195 (S.D.N.Y. 2014) (citing *Stephenson*, 332 F.3d at 81). The court is then obliged to base its ruling on qualified immunity on the facts found by the jury. *Kerman*, 374 F.3d at 119. *See also Harewood v. Braithwaite*, 2014 WL 6867942, at *7 (E.D.N.Y. Dec. 5, 2014) (noting that a court "should review the facts that are material to the qualified immunity issue, as resolved by the jury, to determine whether the officer's conduct was objectively reasonable"). Because qualified immunity is an affirmative defense, a defendant invoking it bears the burden of proof with respect to the facts demonstrating its application. *Garcia v. Jane Does 1-40*, 779 F.3d 84, 92 (2d Cir. 2014); *Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013); *Sudler v. City of New York*, 698 F.3d 159, 174 (2d Cir. 2012).

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle*, 132 S. Ct. at 2093 (quoting *Ashcroft v. al-Kidd*, __ U.S. __, 131 S. Ct. 2074, 2083 (2011)) (internal quotation marks omitted). As a general principle, "[i]t is well established that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." *Stephenson*, 332 F.3d at 77 (quoting *Saucier v. Katz*, 533 U.S. 194, 201-202 (2001) (internal quotation marks omitted). However, "the law must be clearly established in a more particularized sense, that is, in the specific context of the case." *Stephenson*, 332 F.3d at 77 (internal quotation marks and citations omitted). Even if specific conduct at issue in a particular case has not explicitly been held to be unconstitutional, though, a court may "treat the law as clearly established if decisions from this or other circuits clearly foreshadow a particular ruling on the issue." *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014) (internal quotation marks and citations omitted). Indeed, "officials can still be on notice that their conduct violates established law even in novel

factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). In other words, the precise factual pattern at issue in a particular case need not have been ruled upon in a prior decision for it to be clear that an officer's conduct violated a constitutional right. As the Supreme Court has explained, "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Al-Kidd*, 131 S. Ct. at 2083.

Although this Court has not identified precedent from this Circuit involving facts similar to those at issue here, the general principle that only reasonable force may be used by a law enforcement officer is certainly well-established. It is also well-settled that the seriousness of the criminal conduct attributed to the suspect, whether the suspect poses an immediate threat, and whether the suspect is resisting arrest are critical relevant factors in determining the degree of force that may properly be used. *Graham v. Connor*, 490 U.S. at 396.

Moreover, other circuits have addressed the use of asps by officers, and their decisions "clearly foreshadow" how the force used here would be evaluated by a reviewing court in this Circuit. The Sixth Circuit has held in numerous cases that baton strikes to a plaintiff who does not pose a safety risk to officers violates a clearly established right to be free from excessive force. *See, e.g.*, *Baker v. City of Hamilton*, 471 F.3d 601, 608-609 (6th Cir. 2006); *Shreve v. Jessamine Cnty. Fiscal Court*, 453 F.3d 681, 688 (6th Cir. 2006); *Landis v. Baker*, 297 Fed. App'x 453 (6th Cir. 2008). In *Landis*, the Sixth Circuit noted that "the officers should have known that the excessive use of a police baton can cause serious injury and may violate a constitutional right." 297 Fed. App'x at 462. This has been held to be true even where the suspect is being uncooperative and "some degree of force is necessary." *Id*. Similarly, the Ninth Circuit, in *Young v. Cnty. of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011), reversed a decision granting summary judgment on qualified immunity in favor of a traffic officer who, after a

suspect refused his instruction to return to his car and instead remained seated on a curb eating broccoli, struck the suspect with his baton. The Court in *Young* reasoned that "[t]he principle that it is unreasonable to use significant force against a suspect who was suspected of a minor crime, posed no apparent threat to officer safety, and could be found not to have resisted arrest, was . . . well-established." 655 F.3d at 1168.

Reyes does not, and for the reasons stated above could not, dispute that Rickettes had a clearly established right not to be struck with an asp if he was cooperating with the officers and not resisting arrest or hitting or shoving them. Rather, Reyes argues that it was objectively reasonable for him to administer blows to Rickettes' hand with his asp because, in their answers to special interrogatories, the jury found that Rickettes grabbed or reached for his knife. Reyes' argument fails for two reasons. First, as noted above, Reyes bears the burden of proof with respect to qualified immunity, and the jury's answers to special interrogatories demonstrate that Reyes failed to prove by a preponderance of the evidence that he struck Rickettes' finger with his asp only after seeing Rickettes' knife.[2] Second, the discussion above about how the jury may have found the force used by Reyes to be excessive even if Rickettes reached for his knife, although set forth in connection with Reyes' motion for judgment as a matter of law, applies equally to Reyes' qualified immunity argument. *See, e.g., Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 764 n.7 (2d Cir. 2003) (pointing out that, in excessive force cases, the analysis of qualified immunity and the merits may "ultimately converge on one question: Whether in the particular circumstances faced by the officer, a reasonable officer would believe that the force employed was lawful"); *Pub. Adm'r of Queens Cnty. ex rel. Estate & Beneficiaries of Guzman v. City of New York*, 2009 WL 498976, at *5 (S.D.N.Y. Feb. 24, 2009) ("In Fourth

---

[2] As noted above, Special Interrogatory 2 asked, "Was plaintiff's finger struck before defendants saw a knife." The jury did not answer the question yes or no, but instead wrote "unsure" in the margin of the questionnaire.

Amendment unreasonable force cases . . . the qualified immunity inquiry is the same as the inquiry made on the merits . . . Accordingly, the answer to either the qualified immunity or the Fourth Amendment question often resolves the other") (internal citations and quotation marks omitted"); *Washpon v. Parr*, 561 F. Supp. 2d 394, 407-408 (S.D.N.Y. 2008) ("Since the law in this area is well-established, in Fourth Amendment unreasonable force cases, unlike in other cases, the qualified immunity inquiry is the same as the inquiry made on the merits"); *Adedeji*, 935 F. Supp. 2d at 569-70 ("The same evidence that supports the jury's finding of excessive force, however, depicts a . . . factual scenario . . . that makes clear that the nudge was, for substantially the same reasons the jury determined it was objectively unreasonable, clearly unlawful.").

In short, for the same reasons discussed above in connection with defendant's motion for judgment as a matter of law, the jury's finding that Rickettes reached for his knife does not inevitably compel the conclusion that it was objectively reasonable for Reyes to administer subsequent baton strikes to Rickettes' hand. Reyes' qualified immunity motion is accordingly denied.

## III.    Attorney's fees

A plaintiff who prevails in an action brought under 42 U.S.C. § 1983 is eligible to receive an award of reasonable attorney's fees. 42 U.S.C. § 1988(b). The Supreme Court has explained that a prevailing plaintiff is one who "has succeeded on any significant issue in litigation which achieved some of the benefit the parties sought in bringing suit." *Texas State Teachers Ass'n v. Garland Ind. Sch. Dist.*, 489 U.S. 782, 791-92 (1989) (internal quotation marks and brackets omitted). In other words, "the plaintiff must be able to point to a resolution of the dispute which changes the legal relationship between itself and the defendant." *Id.* at 792. Where a plaintiff

succeeds only on some and not all of his claims, he may still be a prevailing party for the purposes of a fee award. Similarly, a jury verdict against only one of two or more defendants does not alter a plaintiff's status as the prevailing party; the inquiry is whether the plaintiff "achieved substantial success in the litigation." *Leblanc-Sternberg v. Fletcher*, 143 F.3d 748, 762 (2d Cir. 1998). Furthermore, while "[n]o fees should be awarded for time spent pursuing a failed claim if it was 'unrelated' to the plaintiff's successful claims," fees are properly awarded for all time spent on claims involving a common core of facts and related legal theories. *Id.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434-35 (1983)).

The reasonableness of an attorney's requested fees is a matter within the district court's discretion. *LeBlanc-Sternberg*, 143 F.3d at 758; *Garcia v. City of New York*, 2013 WL 5574507, at *2 (E.D.N.Y. Oct. 9, 2013). "A reasonable fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case." *Garcia*, 2013 WL 5574507, at *2 (internal quotation marks and brackets omitted) (quoting *Perdue v. Kenny A.*, 559 U.S. 542, 552 (2010)). When determining a reasonable rate for attorney's fees, courts consider "the rate a paying client would be willing to pay," bearing in mind that "a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 522 F.3d 182, 190 (2d Cir. 2008).

### a. Reasonable Hourly Rate

"The reasonable hourly rate reflects factors including the complexity of the case and the quality of counsel's representation." *Stanczyk*, 990 F. Supp. 2d at 247 (citing *Arbor Hill*, 522 F. 3d at 190). There are in addition numerous case-specific variables that courts take into account when determining attorney's fees, including "the attorney's experience and expertise, the novelty and complexity of the issues presented, and the overall success achieved in the case." *See Chen*

*v. Cnty. of Suffolk*, 927 F. Supp. 2d 58, 71 (E.D.N.Y. 2013).  For example, if some of the

plaintiff's claims are dismissed or otherwise do not succeed, the fee may be reduced to take these

circumstances into account.  *Stanczyk*, 990 F. Supp. 2d at 247.  Ultimately, it is left to the Court

to determine what, if any, fees should be awarded, and the burden is on the prevailing party "to

justify the reasonableness of the requested rate."  *Chen*, 927 F. Supp. 2d at 71 (quoting *Blum v.

Stenson*, 465 U.S. 886, 895 n.11 (1984)).  Courts in the Second Circuit follow the forum rule,

which dictates that "courts should generally use the hourly rates employed in the district in

which the reviewing court sits in calculating the presumptively reasonable fee."  *Simmons v. New

York City Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009) (internal quotation marks omitted)

(quoting *Arbor Hill*, 493 F.3d at 119).  In the Eastern District of New York, courts in recent

years have approved hourly rates from $300 to $450 for partners in law firms, $200 to $325 for

senior associates, and $100 to $200 for junior associates.  *Sass v. MTA Bus Co.*, 6 F. Supp 3d

238, 261 (E.D.N.Y. 2014) (collecting cases); *Hargroves v. City of New York*, 2014 WL 1271039,

at *4 (E.D.N.Y. Mar. 26, 2014); *In re Nassau Cnty. Strip Search Cases*, 12 F. Supp. 3d 485, 498

(E.D.N.Y. Apr. 2, 2014); *Gray v. Toyota Motor Sales, U.S.A., Inc.*, 2013 WL 3766530, at *5

(E.D.N.Y. Jul. 16, 2013).  Courts in this district have awarded rates of between $70 and $100 per

hour for work done by paralegals.  *Ferrara v. CMR Contracting LLC*, 848 F. Supp. 2d 304, 313

(E.D.N.Y. 2012).

  Although rates as high as $450 per hour have been awarded to practitioners in civil rights

and other areas, "[t]he highest rates in this district are reserved for expert trial attorneys with

extensive experience before the federal bar, who specialize in the practice of civil rights law and

are recognized by their peers as leaders and experts in their field."  *Hugee v. Kimso Apartments,

LLC*, 852 F. Supp. 2d 281, 300 (E.D.N.Y. 2012).  For example, in *Sass*, an employment

discrimination case, the Court allowed an hourly rate of $425 for a solo practitioner who had

been practicing for over thirty years and had litigated approximately 500 employment

discrimination cases. *Sass*, 6 F. Supp. 3d at 263; *see also Favors v. Cuomo*, 39 F. Supp. 3d 276,

307 (E.D.N.Y. 2014) (approving an hourly rate of $450 for an attorney who had been practicing

civil rights law since 1978 and was the executive director of the Center for Law and Social

Justice at Medgar Evers College). In contrast, a Court found an hourly rate of $350 to be

appropriate for a well-respected civil rights attorney with thirteen years of experience who had

"litigated a large number of civil rights cases and is a first-rate trial lawyer." *Struthers v. City of*

*New York*, 2013 WL 5407221, at *8 (E.D.N.Y. Sept. 25, 2013).

Plaintiff Rickettes seeks an award totaling $82,808.09, comprised of $80,020 in fees and

$2,788.09 in expenses.[3] Pl. Mem. in Support at 3; Pl. Reply at 12. In support of this request, his

attorneys, who are now or were during the litigation employed by the Law Offices of Michael S.

Lamonsoff,[4] have submitted affidavits detailing their educational and legal experience and

attaching their time records as exhibits. Joseph Gorczyca, plaintiff's lead trial counsel, is a

partner in his law office and had been practicing law for approximately six years at the time of

trial. Gorczyca Aff. ¶ 4. He has been recognized for his trial skills and has had numerous trial

successes. Gorczyca Aff. at ¶¶ 5-7. Gorczyca does not normally bill by the hour, but suggests

that an hourly rate of $425 would be appropriate for his time in this case. Gorczyca Aff. ¶ 8.

Ryan Lawlor, also a partner at the firm, requests a rate of $350 per hour. Lawlor Aff. ¶ 7.

Like Gorczyca, he does not normally bill by the hour, but notes in support of his requested rate

that he had been practicing law for approximately four years at the time of trial, and that he

---

[3] These amounts include plaintiff's original requested amount as well as amounts requested for the fee application
itself.

[4] Jessica Massimi no longer works for the Law Offices of Michael S. Lamonsoff, but was an associate there until
September 2013. Lawlor Aff. ¶ 23. The other attorneys are all still employed by the Law Offices of Michael S.
Lamonsoff.

manages the civil rights practice of his law firm. Lawlor Aff. ¶ 5. He further notes that he has handled numerous federal civil rights cases and more than 500 personal injury cases in state court. Lawlor Aff. ¶ 6. Lawlor also includes in his affidavit information about Jessica Massimi, a lawyer who was formerly with the Law Offices of Michael S. Lamonsoff and who represented Rickettes early in the litigation. Lawlor Aff. ¶¶ 23-27. On behalf of Massimi, who now works for a different firm, Lawlor requests an hourly rate of $325. Lawlor Aff. ¶ 26. Massimi has been practicing law for approximately four years and has focused on federal civil rights cases. Lawlor Aff. ¶ 24. Massimi has not provided an affidavit of her own, but Lawlor represents that she has verified the hours attributed to her in the law firm's time sheets. Lawlor Aff. ¶ 27.

Finally, Matthew Shroyer, an associate at the law firm, has provided an affidavit noting that he graduated from law school in 2010 and has worked on many federal civil rights cases. Shroyer Aff. ¶¶ 4-5. He also represents that he is in charge of case screening, pleading, and discovery at the firm. Shroyer Aff. ¶ 5. Like Massimi, Shroyer requests an hourly rate of $325.

Defendant Reyes objects to the requested hourly rates and to any fee award on behalf of Massimi. Def. Mem. in Opp. at 12. He argues that the plaintiffs have not provided sufficient background information about Massimi to indicate that the rate requested for her time is reasonable. Def. Mem. in Opp. at 12. Defendant suggests the following rates for plaintiff's counsel: $275 per hour for Joseph Gorczyca, $225 per hour for Ryan Lawlor, and $125 for Matthew Shroyer. Def. Mem. in Opp. at 8, 10, 11.

Gorczyca is a skilled litigator who represented his client well at trial. Nevertheless, he has not yet accumulated the experience or achieved the stature to merit the highest rates in the district. Even attorneys with decades of litigation experience are often denied such rates. *See Mary Jo C. v. Dinapoli*, 2014 WL 7334863, at *6-*7 (E.D.N.Y. Dec. 18, 2014) (awarding fees at

a rate of $350 per hour to attorney with over 30 years of experience who was a clinical professor at Touro Law Center). Furthermore, this case was not so complicated, nor plaintiff's recovery so extraordinary, that attorney's fees should be increased on that basis. Based on Gorczyca's level of experience and the nature of the case, I conclude that the reasonable hourly rate for his time is $350 per hour.

Lawlor's requested hourly rate is likewise higher than someone with his level of experience merits, but defendant's suggested rate is, as it was for Gorczyca, too low. Rather, given Lawlor's status as a partner at his firm and the quality of his representation, but also taking into account the relative lack of complexity of the case, I conclude that the reasonable hourly rate for his time is $300. Similarly, Shroyer's requested rate of $325 is higher than the norm for an associate attorney with four or five years of experience. I find that the reasonable rate for Shroyer's time is $200 per hour.

Finally, although plaintiff has not submitted an affidavit on behalf of Massimi, Lawlor's declaration affirms that she has verified the number of hours being requested on her behalf, and also provides information about her legal education and experience. This information provides a sufficient basis for determining a reasonable hourly rate for her time.[5] As an associate attorney with approximately four years of experience largely devoted to civil rights cases, I find that the reasonable rate for her time is $200 per hour.

Plaintiff's counsel's invoices indicate that some of the work on the case was performed by paralegals at the firm. Docket Entry 70-1. Plaintiff requests that their time be compensated at a rate of $100 per hour. I find that rate to be reasonable in this case.

---

[5] Defendant cites *Brown v. Starrett City Associates,* 2011 WL 5118438 (E.D.N.Y. Oct. 27, 2011), in support of his contention that plaintiff should not recover for Massimi's time. Defendant's reliance on *Brown* is misplaced. In *Brown*, the time records submitted by plaintiff's counsel attributed hours to an individual about whom no meaningful information at all was provided. *Id.* at *6.

### b. Number of Hours Expended

Plaintiff seeks to be awarded fees for 213.1 hours expended by counsel and 16.5 hours by paralegals. [6] Pl. Mem. in Support at 13; Pl. Reply at 12. From a careful review of the plaintiff's invoices and briefs, it appears that the requested 213.1 hours expended by attorneys break down as follows: 78.1 hours expended by Ryan Lawlor, 71.6 hours by Joseph Gorczyca, 26.2 hours by Matthew Shroyer, and 37.2 hours by Jessica Massimi. Docket Entry 70-1; Pl. Reply at 12. Plaintiff also seeks to be compensated for 16.5 hours of paralegal time and, as noted above, awarded $2,788.09 in costs incurred during the litigation. Pl. Mem. in Support at 13-14.

An attorney requesting a fee award bears the burden of supporting his or her application by submitting "accurate, detailed and contemporaneous time records." *Garcia*, 2013 WL 5574507, at *6 (quoting *N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1147-48 (2d Cir. 1983)). To determine whether the number of requested hours is reasonable, the Court "must examine the hours expended by counsel and the value of the work product of the particular expenditures to the client's case." *Garcia*, 2013 WL 5574507, at *6 (internal quotation marks omitted) (quoting *DiFilippo v. Morizio*, 759 F. 2d 231, 235 (2d Cir. 1985)). A Court may reduce the award requested, including by an appropriate across-the-board percentage, if the time records are inadequate. *See Garcia*, 2013 WL 5574507, at *6. A Court should also exclude from any award "excessive, redundant or otherwise unnecessary hours, as well as hours dedicated to severable unsuccessful claims." *Garcia*, 2013 WL 5574507, at *6 (quoting *Quarantino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999)).

---

[6] This total includes the 176.1 hours plaintiff initially requested for counsel's work, including the preparation of the fee motion, as well as 37 additional hours expended by Lawlor, Gorczyca, and Shroyer in preparing plaintiff's opposition to defendant's motion for judgment as a matter of law and plaintiff's reply on the fee application. Lawlor Aff. Ex. 1; Pl. Reply at 12.

Defendant Reyes objects to the number of hours for which plaintiff requests to be compensated. Def. Mem. in Opp. at 12. He argues that the plaintiff's limited success warrants a reduction in the number of hours for which he should be compensated. Def. Mem. in Opp. at 15. Reyes notes that the jury found liability against only one of the officers, and points out that the plaintiff stipulated before trial to dismissal of his claims against the City of New York and four of the six officers he sued, as well as his claims against all defendants for false arrest. Def. Mem. in Opp. at 15. Furthermore, as noted above, Reyes argues that plaintiff should receive no compensation for the hours expended by Massimi. Def. Mem. in Opp. at 12. Reyes does not suggest that the hours billed by the plaintiff's attorneys were otherwise excessive or inflated, nor does he object to the amount plaintiff requests in expenses.

Although I decline to strike the time expended by Massimi, I agree that some of the requested hours should be stricken because of plaintiff's limited success. While the jury's verdict against Officer Reyes and the award of $100,000 in compensatory damages is certainly a favorable outcome for Rickettes, the fact that he agreed to dismiss several of his original claims shortly before trial warrants a reduction for the hours spent on those claims. The docket sheet indicates that the stipulation of dismissal was filed on December 4, 2014, and the plaintiff's invoices are consistent with that date. Docket Entry 47; Docket Entry 70-1. After reviewing the invoices submitted by the plaintiff, I reduce the number of hours spent on the case before December 4, 2014 by thirty percent, with the result that I award fees based on 71.89 hours of time spent by Ryan Lawlor, 69.44 hours by Joseph Gorczyca, 25.57 hours by Matthew Shroyer, 26.04 hours by Jessica Massimi, and 12.27 hours by the firm's paralegals. The total number of attorney hours for which the firm may collect its fees is 192.94, in addition to the 12.27 paralegal

hours. [7]  At the reasonable rates discussed above, plaintiff may therefore recover $57,420 in attorney's fees.

I also reduce the amount that plaintiff may recover for expenses.  Plaintiff's attorneys provide a breakdown of the costs for which they are requesting reimbursement, the total amount of which is $2,788.09.  Lawlor Aff. ¶¶ 28-32.  They request $512.90 for the costs associated with the depositions of four of the original named defendants.  Since the claims against two of those individuals were dismissed on December 4, 2014, I reduce that amount by half.  Accordingly, plaintiff may be reimbursed for $2,788.09 less $256.45, for a total of $2,531.64 in expenses. Plaintiff is therefore awarded a total of $59,951.64 in fees and costs.

## CONCLUSION

For all the reasons discussed above, the defendant's motion for judgment as a matter of law or, in the alternative, to set aside the verdict on the basis of qualified immunity, is DENIED. The plaintiff's motion for attorney's fees is granted in the amount of $59,951.64, comprised of $57,420 in fees and $2,531.64 in expenses.  The Clerk of Court is respectfully requested to enter judgment accordingly and to close the case.

**SO ORDERED.**

_____/s/_____
**STEVEN M. GOLD**
**United States Magistrate Judge**

Brooklyn, New York
June 23, 2015

U:\MHS 2014-2015\Rickettes v. City of New York\Rickettes final2.docx

---

[7] This calculation of hours was determined by first subtracting the number of hours expended by each attorney and the paralegals after the stipulation was filed from the total number of hours requested for each person.  The result of that subtraction is the number of hours expended before December 4, 2014.  I reduced that number by thirty percent for each individual.  Then, that number—seventy percent of the hours requested for the period before December 4, 2014—was added to the number of hours each person expended after the stipulation was filed.  Finally, I added that to the number of hours requested by each individual for the reply brief and the response to defendant's motion.  Pl. Reply at 12.  That result is the total number of hours to be awarded to each attorney and the paralegals.